**UNITED STATES of America**

**v.**

**Abelardo PADILLA, Appellant.**

**No. 91–1984.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 16, 1992.

Decided Dec. 29, 1992.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Carlos A. Martir, Jr. (argued), Asst. U.S. Attys., Philadelphia, PA, for appellee.

Arnold Silverstein (argued), Wilson & Silverstein, Philadelphia, PA, for appellant.

Before: MANSMANN, HUTCHINSON and GARTH, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

Abelardo Padilla challenges his conviction, after trial by jury, for conspiracy to possess with intent to distribute cocaine. He argues that the government did not present sufficient evidence of a conspiracy and, alternatively, that there was a prejudicial variance between the single conspiracy charged in the indictment and multiple conspiracies he asserts were proven at trial. Because the evidence was sufficient and the variance, if any existed, was not prejudicial, we will affirm.

## I.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3231. We review a claim of insufficient evidence by inquiring whether "there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *United States v. Palmeri,* 630 F.2d 192, 203 (3d Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981).

With this standard of review in mind, we turn to the facts as proven by the government at trial.

## II.

Much of the government's evidence came from Julio Aguilar, a drug dealer, and from tape recordings of his telephone conversations with Padilla. In general, Aguilar testified that he had extensive dealings in cocaine—up to four kilograms per week—and he identified his customers as those who had been recorded on the tapes. Aguilar's modus operandi was to deliver cocaine in person after speaking to a buyer on the telephone.

Regarding Padilla specifically, Aguilar told the jury that he had known Padilla in Columbia, had maintained a relationship with Padilla in this country based on drugs, and had in fact sold cocaine to Padilla on a few occasions. Four telephone conversations, which occurred within one month, implicated Padilla in drug trafficking. Aguilar identified Padilla as the other speaker in three of these calls. Padilla's brother Francisco also testified for the government, identifying Padilla's voice in three calls and the voice of Padilla's wife in the fourth. Aguilar detailed the subject matter of the calls.

In the first conversation, Padilla sought four and one-half ounces of cocaine, valued at approximately $2,400 per quarter-ounce. In the second conversation, about which Aguilar testified extensively, the two commiserated over the scarcity of drugs. Sev-

eral aspects of this second conversation indicate Padilla's involvement in the drug trade with Aguilar: references to lack of work as a result of the scarcity of drugs,[1] concern about the scarcity of drugs and about police activity in tightening the supply of drugs. The jury could have reasonably interpreted one exchange to have included Padilla within the aegis of Aguilar's network.[2] Another statement by Padilla indicated knowledge of large scale trafficking: "[W]ith one seven you can bring it here, including transportation." According to Aguilar, the figure "one seven" meant $17,000, the price of a kilogram.

In the third conversation, Aguilar offered to sell Padilla cocaine, and in the fourth conversation, Aguilar left the price of the drug in a message given to Padilla's wife. The content of this last call is reflected in Aguilar's testimony:

Q: Now looking at this conversation, you asked, "Hello?" and you asked, "Abelardo" and the person says, "Hello?" and you asked, "Is Abelardo there?" and—

A: That's correct correct.

Q: And the voice says, "No, is this Julio speaking?"

A: Yes that's correct.

Q: The person then tells you, "I gave him the message and he waited for a while, but he had to leave."

And then you stated, "Oh! I see." "He said if you had any message for him ..." And you said, "No, tell him I have 24/5."

What were you referring to?

---

1. The transcript reads as follows:
Q: When Abelardo stated to you, "we haven't done anything here in the last three weeks," what did you understand him to mean by that?
A: [Aguilar:] That he didn't have any work in reference to drugs.
R. at 298.

2. The transcript reads as follows:
Q: And when you stated, "Who knows ... that ... who knows if everything gets screwed up. I hope God does not will it brother, at least to let us work for a little while brother." What were you referring to?

A: The price of the drugs.
R. at 304.

In this fourth conversation, the familiarity of the speaker with the identity of the caller (Julio Aguilar), coupled with the references to messages, shows that Aguilar and Padilla had more than occasional contact. Moreover, given Aguilar's earlier testimony that "one seven" meant "$17,000," the jury could reasonably conclude that "24/5" meant "$24,500," an amount consistent with distributable quantities.[3]

The jury found Padilla and his co-defendants, who had all purchased large, distributable quantities of cocaine from Aguilar, guilty of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and of unlawful use of a communication facility in committing a drug offense, in violation of 21 U.S.C. § 843(b). Padilla appealed, arguing that the government's evidence was insufficient to prove a conspiracy and, alternatively, that there was a prejudicial variance between the indictment and proof at trial. We examine each argument in turn.

### III.

■ In arguing that there was insufficient evidence to prove a conspiracy, Padilla characterizes his conversations with Aguilar as "preliminary negotiations." Padilla then relies almost entirely on *United States v. Melchor–Lopez*, 627 F.2d 886 (9th Cir.1980), in which the Court of Appeals for the Ninth Circuit observed that conspiracy requires proof of an agreement and that preliminary negotiations differ from active participation.

A: [Aguilar:] I was thinking that this was the end, that we couldn't get it anywhere and I was saying that maybe we were going to be able to work six more months.
R. at 301 (ellipsis in original).

3. Although Aguilar also testified that he only sold to Padilla in quarter ounce amounts and that "24/5" was the price "of a quarter," the jury was not required to credit that testimony, especially in light of Padilla's request, in the first recorded conversation, for a larger quantity.

Despite Padilla's characterization of the conversations, they were not, when viewed in the light most favorable to the government, preliminary negotiations. Rather, they reflect an ongoing, shared understanding between men who had a relationship based on drugs. The conversations reflect an understanding that drugs were equated with "work" (i.e., distribution), and that Padilla—who had previously bought cocaine from Aguilar—would buy cocaine when available, at "market prices" and in quantities consistent with distribution. The coded nature of the conversations and Aguilar's modus operandi of completing transactions in person raise the clear inference that these conversations reflected a continuing agreement.

■ The rest of Padilla's argument focuses on Aguilar's testimony that Padilla had only actually purchased quarter ounces of cocaine. Padilla asserts that quarter ounces are consistent with personal use, that Aguilar's inability to recall the actual sales dates fails to place the sales within the dates of the conspiracy, and that the sales themselves could not indicate an intent to enter into a conspiracy. This argument fails. The jury was not required to believe Aguilar with respects to amounts. *See, e.g., United States v. Edwards*, 488 F.2d 1154, 1158 (5th Cir.1974). Moreover, even if the jury had credited Aguilar's testimony with respect to previous sales, the crime of conspiracy does not require an actual drug sale. Rather, it requires an agreement. *See, e.g., United States v. Nolan*, 718 F.2d 589, 595 (3d Cir.1983). Aguilar's testimony, the taped conversations, and the drug relationship (evidenced in part by the actual sales) adequately proved the existence of an agreement. Padilla thus focuses too tightly on the actual sales, without accounting for the effect of the other evidence presented to the jury. It was this evidence *together with* the evidence of actual sales that demonstrated the elements of a conspiracy.

## IV.

■ When there is a variance between the indictment and the proof at trial *and* when that variance prejudices a substantial right of the defendant, we have held that the conviction must be vacated. *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989), *cert. denied*, 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990). Padilla argues that there was a prejudicial variance between the indictment and the government's evidence; the indictment alleged a single conspiracy among Padilla, his co-defendants and Aguilar, whereas the government's evidence at trial, according to Padilla, proved multiple, separate conspiracies between Aguilar and individual defendants. Padilla claims that this variance prejudiced his right "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Kotteakos v. United States*, 328 U.S. 750, 775, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). As we detail below, Padilla has not shown either a variance or prejudice.[4]

### A.

Although Padilla argues that a variance exists here, we have concluded in a similar case that a variance did not occur. *United*

---

4. Although Padilla argues that a variance exists here, Judge Garth concludes, as this court has concluded here and in a similar case, *see United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir.1989), that a jury may reasonably infer the existence of a single conspiracy where, as here, each of the alleged co-conspirators were distributors of cocaine, where each knew that his supplier (here, Aguilar) was distributing cocaine to others, and where the patronage of each was "'necessary or advantageous to the overall success of the venture.'" *United States v. Salmon*, 944 F.2d 1106, 1118 (3d Cir.1991) (citations omitted). Judge Garth, having thus concluded that no variance has been shown because there are no multiple conspiracies, but only the single conspiracy found by the jury, finds it unnecessary to reach or discuss the question of prejudice.

Judge Hutchinson joins the Opinion of the Court except with respect to Part IV A. He does not believe the government has shown the connection between Padilla and the other distributors supplied by Aguilar that is necessary to a wheel conspiracy. He agrees with the court, however, that Padilla has failed to demonstrate the kind of prejudice that would lead to reversal under the circumstances of this case.

*States v. Theodoropoulos,* 866 F.2d 587, 593 (3d Cir.1989).

In *Theodoropoulos,* as here, the alleged co-conspirators were linked to the overall conspiracy through Theodoropoulos, a central figure. In response to claims of a variance, we opined:

> There was evidence from which the jury could find, in the phone conversations decoded by Eberhart, that Theodoropoulos directed Karivalis to supply him with cocaine for resale and reported thereafter on the transactions, discussed cocaine dealings with Trelopoulos, negotiated with Peetros over the price of cocaine to be supplied by Peetros and thereafter complained about its form, complained to Barrera about the quality of cocaine supplied by the latter, set up a cocaine delivery to Katsis through Tsokas, and conducted cocaine transactions with Argiris for which Argiris paid him on an ongoing basis.

This court has previously held that drug conspiracies involving numerous suppliers and distributors operating under the aegis of a common core group can be treated as a single conspiracy. *See United States v. Adams,* 759 F.2d 1099, 1109–10 (3d Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). The government need not prove that each defendant knew all the details, goals, or other participants. *Id.* at 1114. In this case, as in *Adams,* there was sufficient evidence from which a jury could have concluded that each drug transaction was a step in achieving the conspiracy's common goal of distributing cocaine for profit. *Id.* at 1109–10.

*Theodoropoulos,* 866 F.2d at 593. Furthermore, we noted that references to a third party made in a taped conversation between Theodoropoulos and a co-conspirator "sufficed to support a conviction for conspiracy on the ground that Berrera [the co-conspirator] knew he was part of a larger drug operation." *Id.* at 594.

Here, as in *Theodoropoulos,* references in the taped conversations by both Aguilar and Padilla to drugs as work and to work as a collective endeavor suffice to support Padilla's conviction for conspiracy on the ground that he knew he was part of a larger operation. These references support the jury's finding of a single conspiracy, which must be sustained if there is substantial evidence to support it. *See United States v. Smith,* 789 F.2d 196, 200 (3d Cir.) (existence of single conspiracy is question of fact for jury which must be sustained on substantial evidence), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).

Padilla ignores *Theodoropoulos* entirely and seeks to employ a three-step inquiry that we first used in *United States v. Kelly,* 892 F.2d 255, 259 (3d Cir.1989); *see also United States v. Salmon,* 944 F.2d 1106, 1116 (3d Cir.1991), to determine whether a series of events constitutes a single conspiracy. In *Kelly,* we asked first, whether the conspirators had a common goal; second, whether the nature of the scheme was such that the agreement contemplated bringing about a continuous result that would not continue without the continuous cooperation of the conspirators;[5] and third, to what extent did the participants overlap in various dealings. *Kelly,* 892 F.2d at 259.

First, Padilla asserts that the government failed to prove he was a cocaine distributor and therefore failed to show a common goal. Second, he asserts that the government did not prove any knowledge on his part of a conspiracy outside of his individual purchases and hence could not prove that he agreed to act in furtherance of the single conspiracy. Third, he asserts that there was no overlap between his co-defendants and himself.

Padilla's reliance on the *Kelly* inquiry is premised in part on his assertion that the government failed to prove any conspiracy to distribute cocaine, an assertion we have rejected above. *See supra,* Part III. His

---

**5.** *See also United States v. Salmon,* 944 F.2d at 1117–18 (second prong of test satisfied where alleged co-conspirators' participation is neces-sary or *advantageous* to the overall success of the venture).

reliance is also substantially premised on the assertion that the government did not offer any evidence that Padilla knew of a larger conspiracy, an assertion we have also rejected above in our discussion of Padilla's telephone conversations. Padilla is correct in asserting that his only connection to the conspiracy shown by the government was through Aguilar, the central figure. Padilla, however, understates the significance of that connection. As was stated in *United States v. DeVarona*, 872 F.2d 114 (5th Cir.1989), the case from which we derived the three-step inquiry, "a single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times. A single conspiracy finding does not require every member to participate in every transaction." *DeVarona*, 872 F.2d at 119 (citations omitted); *see also Theodoropoulos*, 866 F.2d at 593 (sustaining conviction of co-conspirators who operated through central figure); *United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir.) (argument of defendant, who dealt only with one conspirator, that he had no connection with larger conspiracy rejected on ground that "[k]nowledge of all the particular aspects, goals, and participants of a conspiracy ... is not necessary to sustain a conviction"), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).

Thus, under the dictates of *Kelly*, Padilla has not convincingly shown the absence of a single conspiracy. First, there was a common goal to obtain and sell cocaine for profit and knowledge attributable to Padilla of a larger network. Second, Padilla's willingness to buy a distributable amount of cocaine was at least " 'advantageous to the overall success of the venture,' " *Salmon*, 944 F.2d at 1118 (citations omitted), namely, maintaining a continuous demand for the drug. Third, there was some over-

lap with Aguilar, the central figure in the scheme. To the extent Padilla has implied the absence of any of the *Kelly* factors, for example, by asserting there was insufficient overlap between members, we note that the *Kelly* factors are most useful to show the existence of a single conspiracy, but that the absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy.[6]

Moreover, assuming arguendo that Padilla has demonstrated a variance, he must also show prejudice to a substantial right. *Kelly*, 892 F.2d at 258. As we observe below, Padilla has not demonstrated prejudice.

**B.**

■ In *United States v. Camiel*, 689 F.2d 31 (3d Cir.1982), we affirmed a judgment directing a verdict of acquittal based on the trial judge's finding of a variance that caused prejudice "derived from the 'spillover of evidence' from one scheme to another." *Id.* at 37. As we have since observed of *Camiel:*

The presentation of evidence at trial confused the chronology of events and made it extremely difficult for the jury to focus upon the legality of the conduct of specific defendants. *See id.* at 38. We held that a variance was material because "the volume and manner of presentation of the evidence created the likelihood of spillover: *i.e.*, that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another." *Id.*

*United States v. Schurr*, 775 F.2d 549, 557 (3d Cir.1985) (*citing Camiel* ).

Padilla, apparently relying on *Camiel*, argues that "the jury could have linked [him] with distributing drugs merely because he was being tried with other distributors. The jury could have overlooked the

---

6. For example, the agreement by five vandals to deface storefronts under cover of night is no doubt a simple single conspiracy, yet it may lack the second *Kelly* factor since the continuation of the endeavor does not depend on "the continuous cooperation of the conspirators."

*Kelly*, 892 F.2d at 259. Similarly, an actor with knowledge of the entire conspiracy may be part of a single conspiracy even though he has contact with only one member. *E.g., Adams*, 759 F.2d at 1114.

likelihood that [he] was buying for personal use, solely because of his association with a seller who sold to the other defendants for the purposes of resale." Br. of Appellant, Abelardo Padilla, at 19. We disagree.

Unlike the presentation of evidence in *Camiel*, which we described as "presented by the prosecution in a manner that lent itself to jury confusion," 689 F.2d at 38, the presentation against the defendants here proceeded seriatim. Aguilar first described his relationship to each defendant in turn, then all the tapes of each defendant were played together. Specifically, the jury heard all four tapes implicating Padilla at once, without the confusing interruption of tapes of other defendants. We thus reject Padilla's contention that his trial with other defendants prejudiced the jury or that the government did not "adequately insulate [Padilla] from the harmful spillover effects of evidence introduced against another defendant." *Camiel*, 689 F.2d at 38.

Similarly, we reject Padilla's contention that his association at trial with Aguilar, "a seller who sold to the other defendants for purpose of resale," was prejudicial. Indeed, because Aguilar testified as the government's star witness that he had a drug relationship with Padilla, Padilla's "association" with him was not only unavoidable. Presumably, it was an integral part of the government's case, whether or not Padilla was tried alone. Likewise Aguilar's identity as a wholesale distributor of cocaine would have been part of the government's case against Padilla, whether or not Padilla was tried alone.

In sum, Padilla has failed to show that a variance existed and has failed to show any prejudice that might have occurred if a variance had existed.

## V.

Padilla also argues that if his conviction for conspiracy were invalid, then his conviction for unlawful use of a communication facility would also be invalid. This is so, he argues, because absent a conspiracy, the telephone calls upon which the communication conviction depends were not unlawful.

Because we have rejected its premise—that the conspiracy conviction is invalid—this argument is of no avail.

## VI.

For the foregoing reasons, we will affirm the judgment of the district court.