John E. Jones III, United States District Judge
Currently pending before the Court are four motions to dismiss filed by Defendant Ben Wootton and joined by Defendant Race Miner by Order dated October 16, 2018. (Doc. 92). Those motions are as follows: Defendant Ben Wootton's Motion to Dismiss Counts 1, 3-8, and 9 with Incorporated Brief, (Doc. 70), Defendant Ben Wootton's Motion to Dismiss Count 9 - Failure to Allege Commission of a Crime, (Doc. 72), Defendant Ben Wootton's Motion to Dismiss Count 2 - Duplicitous, (Doc. 73), Defendant Ben Wootton's Motion to Dismiss Count 2 - Statute of Limitations, (Doc. 74). Also pending are Defendant Race Miner's Motion to Dismiss Count 2, (Doc. 93), Defendant Race Miner's Motion to Sever Defendant, (Doc. 98), and Defendant Ben Wootton's Motion for Severance of Charges, (Doc. 71). All of these motions have been fully briefed and are ripe for disposition. For the reasons that follow, all of these aforementioned motions shall be denied.
I. STATEMENT OF FACTS
On May 3, 2017, the Government charged Ben Wootton, Race Miner, and Keystone Biofuels in a seven count Indictment, alleging that Wootton, Miner, and Keystone conspired to commit a criminal offense. (Doc. 1). On January 24, 2018, the Government filed a nine-count Superseding Indictment, the operative indictment in this case. (Doc. 41). In Count 1, the Government charged that, between August 13, 2009 and September 24, 2013, Wootton, Miner, and Keystone conspired to falsify or conceal a material fact or make materially false or fraudulent statements to the Environmental Protection Agency ("EPA"). According to the Government, Wootton, Miner, and Keystone unlawfully generated over sixteen million biodiesel Renewable Identification Numbers ("RINs") through the EPA's online Moderated Transaction System, knowing that the biodiesel for which these RINs were being generated did not meet the standards established by the American Society of Testing and Materials provision D6751 ("ASTM D6751") as required by EPA regulations. These RINs were then traded or sold pursuant to the Energy Independence and Security Act of 2007, generating in excess of $10 million for Wootton, Miner, and Keystone. As overt acts in furtherance of this conspiracy, the Government cited emails between unindicted co-conspirators, Wootton, and Miner which indicated that samples of Keystone's biodiesel had failed testing for conformity with ASTM D6751, as well as certificates signed by Wootton which certified that the biodiesel for which Keystone had generated the RINs conformed to ATSM D6751. Relatedly, in Counts 3 through 8 of the Superseding Indictment, the Government alleged that the codefendants' false statements to the EPA directly violated 18 U.S.C. § 1001, *315 the predicate crime underlying the conspiracy charge.
In Count 2, the Government charged that Wootton and Miner conspired to defraud the Internal Revenue Service ("IRS"). As relevant background, the IRS provides a refundable Biodiesel Mixture Credit ("BMC") to individuals or businesses that mix[1] standard diesel fuel with biodiesel for use or resale. The refundable credit is equal to one dollar for each gallon mixed and is obtained by filing IRS Form 8849, along with that form's accompanying schedule wherein the applicant notes the amount of biodiesel mixed and provides a signed certificate confirming under penalty of perjury that the reported biodiesel conforms to ASTM D6751. According to the Government, between January 7, 2009 and February 16, 2012, Wootton and Miner claimed the BMC for biodiesel that had been mixed but did not conform to ASTM D6751 ("off-spec fuel"), for fuel that was never produced ("phantom fuel"), and for fuel that had never been mixed ("unmixed fuel"). The Government also contended that Wootton and Miner covered up their fraud by manufacturing false test reports through Miner's Colorado-based fuel testing lab, RAAM Analytical, Inc., and that Wootton and Miner falsified Keystone's books and records by entering sham purchases and sales of feedstock (a component of blended biofuel) and false bills of lading for transactions that never occurred. The Government also contended that the codefendants then provided those fictitious documents to the IRS during its investigation of Keystone. In addition to these falsified documents, the Government pointed to communications between Wootton and "Company D" wherein Wootton warned Company D that the IRS may contact the company and that Company D should let Wootton know if it does. According to the Superseding Indictment, Wootton later told Company D's representative specific figures to report to the IRS so as to avoid further investigation by the IRS. Relatedly, in Count 9, the Government averred that Wootton and Miner aided and assisted in the preparation of false tax claims in violation of 26 U.S.C. § 7206(2).
II. DEFENDANTS' MOTIONS TO DISMISS
A federal indictment need include only "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and "the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." FED.R.CRIM.P. 7(c)(1). An indictment is sufficient under Rule 7 if it:
(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.
United States v. Kemp , 500 F.3d 257, 280 (3d Cir. 2007) (quoting United States v. Vitillo , 490 F.3d 314 (3d Cir. 2007) ). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." Id. (quoting United States v. Rankin , 870 F.2d 109, 112 (3d Cir. 1989) ).
*316 Federal Rule of Criminal Procedure 12(b)(3)(B) allows a criminal defendant to file a motion to dismiss an indictment on the basis that the indictment is duplicitous, multiplicitous, lacks specificity, improperly joins defendants or charges, or fails to state an offense. FED. R. CRIM. P. 12(b)(3)(B). However, "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." United States v. DeLaurentis , 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). Rather, "[i]n evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment" and "determin[e] whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged." United States v. Huet , 665 F.3d 588, 595-96 (3d Cir. 2012).
a. Defendants' Motion to Dismiss Counts 1, 3-8, and 9 Based Upon the Government's Failure to Allege the Commission of Criminal Conduct, the Rules of Statutory Construction, the Rule of Lenity, and the Void for Vagueness Doctrine
In their first set of issues, Defendants move to dismiss Counts 1, 3-8, and 9 of the Superseding Indictment for a variety of reasons. By way of background, Defendants outline the history of ASTM D6751 and its development as a part of Congress' delegation of the Renewable Fuel Standard program ("RFS program") to the EPA. For purposes of this memorandum, it is sufficient to note that, according to Defendants, ASTM D6751 provides a qualitative definition of blended biofuel at "time and place of delivery," without further defining the contours of that assertedly-nebulous period. (See Doc. 70 at 9). Defendants also posit that the RFS program designates violations of this qualitative regulation as a strict-liability offense subject to only civil penalties.
With that background, Defendants aver that the Government has failed to prove that the biodiesel for which Defendants generated RINs in Counts 1 and 3-8 or for which the Defendants applied for the BMC in Count 9 did not comply with ASTM D6751. Defendants contend that the Government's reliance upon mid-production analyses to prove that Keystone's final product did not comply with ASTM D6751 at "time and place of delivery" as required by ASTM D6751, fails to consider that Keystone remedied the final product prior to delivery to comply with the regulation. Moreover, Defendants postulate, if the Government conducted their own tests outside of Keystone's facility following delivery, the Government has failed to show that those tests reliably measured the fuel's compliance with ASTM D6751 because it is entirely possible that the tested fuel was tainted in some way after delivery. Indeed, Defendants argue, despite the voluminous discovery turned over, the Government has failed to identify the results of a single post-production test and, importantly, the Government has failed to identify a single customer complaint concerning the quality of Keystone's biofuels. Accordingly, Defendants conclude, in the absence of direct evidence proving that Keystone's biofuel for which it generated RINs or requested the BMC did not conform to ASTM D6751 at the time and place of delivery, there can be no conspiracy as charged in Count 1, no false statements as charged in Counts 3-8, and no aiding or assisting in the preparation of false tax claims in Count 9.
Alternatively, Defendants argue that, because the RFS program designates a violation of ASTM D6751 as a purely civil offense, the plain meaning rule of *317 statutory construction[2] dictates that violating that framework cannot impart criminal penalties in the instant case. Accordingly, Defendants theorize, the instant prosecution must be dismissed. Concurrently, Defendants posit that, because there is at least an ambiguity in the law concerning whether the violations alleged in the Superseding Indictment are criminal or civil, the rule of lenity[3] mandates that the ambiguity be resolved in Defendants' favor. Therefore, Defendants conclude, the charges pending against them must be dismissed.
Finally, Defendants charge that ASTM D6751 should be deemed void for vagueness. According to Defendants, because ASTM D6751 maintains strict standards for biodiesel "at the time and place of delivery"-without further defining what that means-the regulation is vague and must be voided. In turn, Defendants argue, because Counts 1, 3-8, and 9 rely upon ASTM D6751 as the basis for the charges, those charges must be dismissed.
In response, the Government asserts that Defendants' arguments fail to consider the deferential standard of review applicable to a motion to dismiss in the criminal context and improperly ask this Court to evaluate the sufficiency of the Government's evidence. The Government posits that, at trial, it will present evidence showing that Keystone did not produce fuel meeting the requirements of ASTM D6751, nonetheless generated RINs, and claimed the relevant tax credits. The Government further notes that, at this stage, taking the allegations in the Superseding Indictment as true as is the district court's obligation, the Superseding Indictment sufficiently outlines the elements of the offenses charged and the facts in support thereof, and dismissal is not warranted. Indeed, the Government argues, Defendants' self-serving pretrial claims that they remedied mid-production tests which indicated that the biodiesel failed to comply with ASTM D6751 prior to delivery, or that none of Keystone's customers ever complained concerning the quality of Keystone's biofuels, are insufficient to overcome the veracity of the Superseding Indictment's allegations.
Concerning the Defendants' construal of the RFS program and ASTM D6751 as imposing only civil penalties, the Government points out that it has not alleged that the Defendants violated the RFS program's regulatory framework. Rather, Defendants are charged with conspiracy to defraud the EPA and the IRS and other associated predicate crimes-crimes that are wholly separate from and unrelated to the RFS program. The fact that the crimes alleged rely upon definitions in ASTM D6751 as the basis for allegations of fraud and false statements does not import the civil penalties outlined thereunder as the only basis for the Government to proceed. For the same reason, the Government posits, neither the plain meaning rule, nor the rule of lenity, nor the void for vagueness doctrine warrant dismissal of the instant prosecution. According to the Government, *318 the plain meaning of the statutes under which Defendants have been charged is well settled and the vagueness of ASTM D6751 or other RFS program regulations have no bearing upon the application of those statutes. We agree with the Government.
First, in challenging the Superseding Indictment as they have, Defendants have failed to consider the deferential standard of review applicable to a criminal pretrial motion to dismiss. A federal indictment requires "no greater specificity than the statutory language ... so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." Kemp , 500 F.3d at 280 (quoting Rankin , 870 F.2d at 112 ). Indeed, "[i]n evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment." Huet , 665 F.3d at 595. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." DeLaurentis , 230 F.3d at 660. Thus, even if, as Defendants aver, the allegations in the Superseding Indictment would be insufficient to sustain the Government's burden of proof at trial, the Government's recitation of the elements of the offense charged, coupled with sufficient facts to place Defendants on notice to prepare a defense and avoid double jeopardy, is sufficient to sustain the Superseding Indictment's viability and deny Defendants' motion to dismiss. That is, even if Defendants' factual averments that the Government relied upon mid-production analyses to allege that Keystone's final product did not comply with ASTM D6751 at "time and place of delivery," that the Governments tests did not reliably measure the fuel's compliance with ASTM D6751 at the time and place of delivery because the fuel was tainted after the fact, and that not a single customer complained concerning the quality of Keystone's biofuels, are, in fact, proven at trial, because the Government's allegations that Keystone's biofuel for which it generated RINs and claimed the BMC did not comply to ASTM D6751 must be taken as true at this juncture, dismissal is not warranted at this stage of the prosecution. See id.
Second, Defendants' reliance upon the rules of statutory construction, the rule of lenity, and the void for vagueness doctrine are misguided. All of Defendants' arguments supporting this line of reasoning assume that the Defendants have been charged with violations of the RFS program and/or ASTM D6751 specifically. However, Defendants fail to consider that, although the conspiracy and predicate offenses with which they have been charged necessarily rely upon the definition of biodiesel as outlined in ASTM D6751, the Defendants have actually been charged with conspiracy to make false statements to the EPA and the IRS in violation of 18 U.S.C. § 371, as well as violations of 18 U.S.C. § 1001 and 26 U.S.C. § 7206(2) as predicates for those conspiracies. These crimes are statutorily unrelated to the RFS program and are subject to criminal penalties as a matter of routine. Accordingly, contrary to Defendants' assertions, there is no ambiguity in the law concerning whether the violations alleged in the Superseding Indictment are civil or criminal, and, therefore, neither the rules of statutory construction nor the rule of lenity militate in favor of dismissing this prosecution. For the same reason, Defendants' cursory assertion that ASTM D6751 should be voided for vagueness also fails. In generating the RINs at issue in this case and by claiming the BMC, Defendants were obligated to certify that the biodiesel produced met the requirements *319 of ASTM D6751, regardless of whether that regulation is enforceable as a civil matter in-and-of itself. As such, even if this Court were to determine that ASTM D6751 is void for vagueness, which is decidedly not our task at this juncture, Defendants could still be prosecuted for falsely claiming that the fuel at issue conformed to ASTM D6751. Accordingly, Defendants motion to dismiss Counts 1, 3-8, and 9 shall be denied.
a. Motion to Dismiss Count 2 Based upon Duplicity
In their second set of issues, Defendants argue that Count 2 should be dismissed as duplicitous. Specifically, Defendants aver that, although Count 2 is framed as a single conspiracy, it is, in fact, three separate conspiracies that involve different overt acts, different locations, and different participants. Therefore, Defendants conclude, Count 2 is duplicitous and must be dismissed.
According to Defendants, Count 2 is comprised of three conspiracies. The first conspiracy involved off-spec fuel that was mixed but did not comply with ASTM D6751, was alleged to have occurred between 2009 and 2012, and took place at Keystone's Shiremanstown facility and at Keystone's Camp Hill facility. The second conspiracy involved the never-produced phantom fuel and was alleged to have occurred in only 2009 at only the Shiremanstown facility. The third conspiracy involved the unmixed fuel and was alleged to have occurred between December 2011 and January 2012 at only Keystone's Camp Hill location. In further support of their view that these allegations constitute distinct conspiracies, Defendants explain that the Government has alleged that the Defendants tried to cover up only the phantom fuel conspiracy by falsifying transaction records, but did not do so in the other two alleged conspiracies. Thus, Defendants aver, each conspiracy involves different witnesses, took place at different times, and in different locations, and, therefore, cannot be charged in a single count.
In further support of their position, the Defendants rely upon United States v. Kelly , 892 F.2d 255 (3d Cir. 1989). In Kelly , the Third Circuit identified "a three-step inquiry to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies" for purposes of evaluating whether there was a "variance between the conspiracy alleged in the indictment and the evidence presented at trial" and whether "[t]he jury's finding of a single conspiracy is supported by sufficient evidence." Id. at 259-60. The Third Circuit opined:
First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether "the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators." Third, we examine the extent to which the participants overlap in the various dealings.
Id. (internal citations omitted).
The Defendants argue that under the Kelly test, Count 2 includes multiple conspiracies because the "unmixed fuel conspiracy has no common goal with the other two conspiracies." (Doc. 77 at 5). Specifically, "because failing to splash biodiesel with inexpensive diesel clearly would save only a few dollars in a multi-million dollar sale, and, thus, purposefully failing to splash is not an action taken to enrich anyone," the unmixed fuel conspiracy is separate and distinct from the others. (Id. ). Moreover, Defendants argue generally that each conspiracy's success is unrelated to the success of the others. Thus, Defendants reiterate, Count 2 involves *320 three distinct conspiracies, is duplicitous, and must be dismissed. In closing, Defendants baldly suggest that the only reason the Government included the phantom fuel conspiracy within the Superseding Indictment at all was to render the Superseding Indictment's other allegations timely. Thus, Defendants note, the fact that the phantom fuel conspiracy was thrown in for that purpose further suggests that the allegations in Count 2 constitute distinct conspiracies and that Count 2 is duplicitous.
In response, the Government argues that, although the conspiracy between Wootton and Miner to defraud the IRS by fraudulently claiming the BMC may have involved a number of false representations (i.e. , off-spec fuel, phantom fuel, and unmixed fuel), those representations were all made as part of the same underlying agreement. Relying upon the Kelly inquiry, the Government contends that each false representation necessarily depended upon the co-conspirators' fraudulent proposition that the biodiesel conformed to ASTM D6751. Thus, the Government delineates:
As alleged, the key conspirators, Ben Wootton, and Race Miner, had an agreement between themselves and with other conspirators to defraud the IRS by submitting false Forms 8849 to the IRS and by concealing their fraud through sham paperwork and transactions. While the Forms 8849 may have been false in different ways over the course of the conspiracy (and, in fact, were consistent in falsely representing the quality of the fuel), the overarching goal (defrauding the IRS) and the overarching method of obtaining that goal (submitting false Forms 8849) remained the same.
(Doc. 89 at 8). We agree.
An indictment is duplicitous where it combines two or more "distinct and separate offenses in a single count." United States v. Rigas , 605 F.3d 194, 210 (3d Cir. 2010). "Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary rulings, or endanger fair sentencing." United States v. Haddy , 134 F.3d 542, 548 (3d Cir.1998) (internal citations omitted). However, "[i]t is well established that '[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous.' " United States v. Reyes , 930 F.2d 310, 312 (3d Cir.1991) (quoting Braverman v. United States , 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942) ). "Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." United States v. Bobb , 471 F.3d 491, 494-95 (3d Cir. 2006) (citing Braverman , 317 U.S. at 53-54, 63 S.Ct. 99 ). "The issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." Id.
Although, as noted, our Court of Appeals has provided a three-part inquiry to identify whether a "series of events constitutes a single conspiracy or separate and unrelated conspiracies," see Kelly , 892 F.2d at 259, because that test was announced in the context of a post-trial sufficiency of the evidence analysis, that test cannot be dispositive of whether a defendant's pre-trial motion to dismiss based upon the purported duplicity of a conspiracy count in an indictment should be granted; particularly because, at the pretrial stage of a prosecution, this Court's standard of review requires us to accept as true all of the allegations in the Superseding Indictment. Moreover, subsequent decisions have clarified that "the absence of one [ Kelly ] factor does not necessarily defeat an inference of the existence of a *321 single conspiracy." United States v. Padilla , 982 F.2d 110, 115 (3d Cir. 1992). By way of example, the Padilla Court specified that, an "agreement by five vandals to deface storefronts under cover of night is no doubt a simple single conspiracy, yet it may lack the second Kelly factor since the continuation of the endeavor does not depend on 'the continuous cooperation of the conspirators.' " Id. at 115 n.6 (quoting Kelly , 892 F.2d at 259 ).
On its face, Count 2 of the Superseding Indictment outlines a single conspiracy to defraud the IRS by unlawfully claiming the BMC in a variety of ways. This end was alleged to have been achieved by claiming the credit for fuel that was mixed but was not actually eligible for the credit (the off-spec fuel), for fuel that was never produced (the phantom fuel), and for fuel that had never been mixed (the unmixed fuel). "Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives.' " Bobb , 471 F.3d at 494-95. The Defendants' attempt to view the Kelly factors in isolation overvalues the dispositive nature of that test in the pre-trial phase and Defendants' hyper-technical application of that test is misguided.
Even so, because Kelly is instructive in the post-trial context as to whether the Government has provided sufficient evidence of a single or multiple conspiracies, that test is in some ways helpful sub judice . Indeed, the allegations in Count 2 meet at least two out of the three Kelly factors.
First, it is clear that the Superseding Indictment alleges that Wootton and Miner "contemplated bringing to pass a continuous result"-namely, enriching themselves by defrauding the IRS, thus meeting the first Kelly factor. See Kelly , 892 F.2d at 259. Second, it is also clear that "the participants overlap in the various dealings," namely, Wootton and Miner, thus, meeting the third Kelly factor. See id. Third, although it is less clear whether that continuous results depended upon the continuous cooperation of the conspirators, as noted in Padilla , the Kelly test is not to be applied rigidly; failure to meet one element does "not necessarily defeat an inference of the existence of a single conspiracy." Padilla , 982 F.2d at 115. Indeed, the exception outlined in Padilla regarding the five vandals that conspired to deface storefronts is apt when analogized to the instant case. The fact that Wootton's and Miner's single conspiracy to defraud the IRS may have involved multiple fronts which may or may not have been dependent upon each other does not transform that single conspiracy into multiple conspiracies thereby necessitating the extreme remedy of dismissal. Thus, whatever value the Kelly inquiry serves in the pretrial motion to dismiss analysis, it is clear that Count 2 meets at least two out of the three Kelly factors and, therefore, Kelly militates in favor of finding a single conspiracy. Accordingly, we do not find Count 2 to be duplicitous and the Defendants' motion to dismiss premised thereon shall be denied.
b. Motion to Dismiss Count 2 Based upon Statute of Limitations and Count 9 for Failing to Allege the Commission of a Crime
In their third set of issues, Defendants argue that Count 2 is barred by the six-year statute of limitations applicable to conspiracy to defraud the IRS. Although Defendants recognize that the Government has alleged in Count 2 that Wootton and Miner submitted a fraudulent IRS Form 8849 as late as January 31, 2012 and, therefore, the January 24, 2018 Superseding Indictment was filed within the relevant *322 limitations period, Defendants aver that, because that overt act was not actually unlawful, and the other allegations in Count 2 are rendered timely only because of that January 31, 2012 submission, Count 2 must be dismissed in its entirety. According to Defendants, the Government's factual averments in support of Counts 2 and 9 are "mere assumptions" that are "unsupported by any evidence," and that, in fact, Defendants were justified in submitting Form 8849 on January 31, 2012 because they had properly "splashed the biodiesel with diesel" and thereby "became eligible to apply for and receive the credits." (Doc. 72-1 at 2-3). Relatedly, Defendants allege that, because Count 9 relies upon that January 31, 2012 IRS submission as the basis for the aiding and assisting in the preparation and presentation of false tax claims charge, Count 9 should also be dismissed for failing to allege the commission of a crime.
In response, the Government contends that this Court's well-settled standard of review dictates that, at this stage of the prosecution, the Court must accept as true all of the Superseding Indictment's allegations. Therefore, the Government concludes, Defendants' motion to dismiss Count 2 based upon the statute of limitations "should be denied because the government has alleged an overt act falling within the applicable statute of limitations ... [r]egardless of the defendant's beliefs about the correctness of the allegation." (Doc. 87 at 3). Indeed, the Government points out, Defendants concede in their brief that, "[i]f these allegations are correct, the Government timely charged Defendants with the misconduct alleged in Count 2." (Doc. 74 at 3).
The Government also explains that the allegations in Count 9 satisfy this same well-settled standard. According to the Government, "Count Nine alleges the elements of the offense and goes beyond those elements to sufficiently apprise the defendant of the nature of the charge against him and to allow him to prepare his defense." (Doc. 88 at 5). Moreover, the Government avers that, at bottom, Defendants' challenge to Count 9 is based on their contention that the Superseding Indictment lacks sufficient evidence to support the claim-an improper inquiry at this preliminary, pretrial stage.
In their Reply brief, Defendants maintain that, despite our well-standard of review, this Court is authorized to hold an evidentiary hearing concerning the lawfulness of the January 31, 2012 IRS submission and then use the evidence gleaned at that hearing to dismiss Counts 2 and 9 under United States v. McGill , 964 F.2d 222 (3d Cir. 1992). In McGill , the Third Circuit held that, in analyzing the joinder of charges under Fed.R.Crim.P. 8(a), "[t]rial judges may look beyond the face of the indictment to determine proper joinder in limited circumstances. Where representations made in pretrial documents other than the indictment clarify factual connections between the counts, reference to those documents is permitted." McGill , 964 F.2d at 242. Accordingly, "[u]nder the authority of McGill ," Defendants "strongly recommend" that the Court convene a pretrial evidentiary hearing, because, in the event that the charges in Count 9 are later subject to dismissal under Fed.R.Crim.P. 29 (concerning a motion for judgment of acquittal), "the jury will have been improperly exposed to evidence regarding the IRS charges. The prejudice which this would occasion and the result which might occur-a mistrial-significantly outweighs the otherwise legitimate basis for joinder of charges for trial." (Doc. 100 at 3-4). We disagree.
In this case, Defendants have failed entirely to identify why this Court's *323 well-settled standard of review does not preclude the relief sought. Indeed, Defendants concede that, if the allegations in the Superseding Indictment are true, the Government has stated a charge that is not barred by the relevant limitations period. Thus, despite Defendants' insistence that the alleged overt act in furtherance of the conspiracy of January 31, 2012 was in fact lawful, because our standard of review dictates that we accept as true the Government's contention that it was unlawful, Defendants have failed to show that they are entitled to relief, and their Motion to Dismiss Count 2 as barred by the statute of limitations shall be denied. For the same reason, Defendants' motion to dismiss Count 9 for failing to allege commission of a crime also shall be denied. In essence, Defendants assert that the Government has failed to provide sufficient evidence to support the charges lodged against them. To reiterate, the Third Circuit has specifically held that such arguments are improper at this stage of the prosecution. See DeLaurentis , 230 F.3d at 660 ("[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence.").
Finally, Defendants' reliance upon McGill is misguided. McGill 's holding that a trial court may, "in limited circumstances," look to documents referenced in pretrial filings to decide pretrial joinder issues does not authorize this Court to conduct a pretrial evidentiary hearing for the purposes of evaluating a defendant's pretrial motion to dismiss a count of the indictment. To expand McGill 's statement as Defendants request flies in the face of this Court's well-settled standard of review in the pretrial motion to dismiss context and would, in essence, force the trial court to conduct a pretrial mini-trial simply because a defendant alleges that the Government has failed to adequately support the charges levied against that defendant in a criminal indictment. Doing so would render trial nugatory and usurp the role of the jury as fact-finder. Indeed, Federal Rule of Criminal Procedure 12(b)(3) under which Defendants have raised the instant motion allows a criminal defendant to file pre-trial motions only when "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." FED.R.CRIM.P. 12(b)(3). Other than a single out-of-context quotation from McGill , Defendants have failed entirely to identify the procedural and/or precedential basis for their request. Accordingly, Defendants' motion to dismiss Count 2 based upon statute of limitations and Count 9 based upon failure to allege the commission of a crime shall be denied.
III. DEFENDANTS' MOTIONS TO SEVER
Fed.R.Crim.P. 8 provides that an indictment may charge a single defendant with multiple counts so long as "the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED.R.CRIM.P. 8. Likewise, an indictment may charge two or more defendants in the same document provided "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." Id. Nonetheless, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM P. 14(a). The decision *324 to sever is within the discretion of the trial court. United States v. Reicherter , 647 F.2d 397, 400 (3d Cir. 1981). A defendant seeking severance bears the "heavy burden" to "demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." Id. "Mere allegations of prejudice are not enough; and it is not sufficient simply to establish that severance would improve the defendant's chance of acquittal." Id.
a. Wootton's Motion to Sever Counts 2 and 9
In his motion, Wootton asks this Court to sever Counts 2 and 9 concerning the IRS-related frauds from Counts 1 and 3-8 concerning the EPA-related frauds. Although recognizing that "similarities exist in the proof which will be presented in support of both the EPA [frauds in Count 1 and Counts 3-8] and the IRS frauds [in Counts 2 and 9]," Wootton contends that "the trial of the two distinct conspiracies in a single trial is inherently prejudicial," (Doc. 71), and that severance is warranted because the two prosecutions amount to "repetitious wrongdoing" that is not "temporally related." (Doc. 75 at 2). Wootton also argues that the Government's decision to include Counts 2 and 9 within the Superseding Indictment was "motivated by a desire to provide a date within the applicable statute of limitations." (Id. at 3). Thus, Wootton concludes, because the EPA-related charges in Counts 1 and 3-8 were rendered timely only by including the IRS-related charges in Counts 2 and 9, joining the two prosecutions in one trial would be inherently prejudicial, and the charges must be severed.
In response, the Government contends that all of the charges in the Superseding Indictment have a strong transactional nexus sufficient to warrant joinder under Fed.R.Crim.P. 8 -that is, whether the biodiesel at issue was eligible for the credits at issue-and that Wootton has demonstrated no more than generic prejudice inherent in any multi-count indictment. Here again, we agree with the Government.
At bottom, Wootton's arguments constitute generalized allegations "that severance would improve [his] chance of acquittal." See Reicherter , 647 F.2d at 400. In his first argument, Wootton proposes that joining the EPA-related charges with the IRS-related charges provides the Government with a more robust case and, for that reason, severance is warranted. Wootton's alternative argument-that this Court should sever Counts 2 and 9 from the Superseding Indictment because without them the remaining Counts would be barred by the statute of limitations-suffers the same defect. Setting aside the question of whether the Superseding Indictment was rendered timely only because of Counts 2 and 9, Wootton is in essence arguing that, if this Court grants severance of Counts 2 and 9, then dismissal of the Superseding Indictment as untimely would be warranted and, therefore, his chances of acquittal would be higher. This argument puts the proverbial cart before the horse and amounts to no more than a generalized allegation that severance would improve his chances of acquittal. These arguments have been squarely rejected by the Third Circuit. See Reicherter , 647 F.2d at 400. Thus, Wootton's averments have failed to "demonstrate clear and substantial prejudice resulting in a manifestly unfair trial," and are simply insufficient to carry the heavy burden he bears in seeking severance. Id. Accordingly, we shall deny Wootton's motion to sever.
b. Miner's Motion to Sever his Trial from that of his Codefendants
In his motion, Miner argues that his trial should be severed from that of his *325 codefendants for two primary reasons. First, Miner charges that, at trial, he and Wootton will present what Miner characterizes as irreconcilably antagonistic defenses. According to Miner, he was the sole owner and operator of Keystone until 2010, when he sold the business to Wootton, and moved to Colorado. In the years between the transfer of the business and the Superseding Indictment, Miner alleges that Wootton embezzled a significant sum of money from Keystone and independently "tamper[ed] with production" at the Keystone facility in order to bankrupt the company and, thereby, conceal his embezzlement from investors. (Doc. 99 at 6). In so contending, Miner "points the finger directly towards" Wootton as the sole actor in the conduct alleged in the Superseding Indictment. (Id. ). In turn, Miner suspects that "Wootton, of course, will deny these allegations and continue to blame any quality issues with the biodiesel on Mr. Miner, as he has done in the past with the investors." (Id. ). Accordingly, Miner argues, severance is warranted because "the defenses are so profoundly inconsistent and irreconcilable that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the defense of the other." (Id. ).
In support thereof, Miner relies upon United States v. Provenzano , 688 F.2d 194 (3d Cir. 1982), abrogated on other grounds by In re Insurance Brokerage Antitrust Litigation , 618 F.3d 300, 371-73 (3d Cir. 2010). In Provenzano , two defendants were convicted of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and conspiracy. On appeal, one of the codefendants, Defendant Colter, argued that he had been the victim of a concerted strategy by his codefendants to peg him as the only culpable defendant and, therefore, the codefendants' antagonistic defenses should have warranted separate trials. The Third Circuit disagreed. In short, the Third Circuit held that " 'the mere presence of hostility among defendants' is insufficient to require separate trials." Id. at 198 (quoting United States v. Barber , 442 F.2d 517, 530 (3d Cir. 1971) ). The panel further noted that Defendant Colter's argument was particularly unpersuasive considering the fact that the codefendants (including Defendant Colter) had been charged with conspiracy. Thus:
[I]f the jury had been persuaded that Cotler alone received the payoffs and was unconnected with any of the other defendants, there would have been a failure of proof on the conspiracy and RICO counts. Not only his co-defendants, but Cotler as well, would have walked away from the indictment had sole culpability been fastened on him.
Id.
Alternatively, in the instant case, Miner argues generally that severance is warranted because "the jury [will] be unable to separate culpability between Mr. Miner and Mr. Wootton as to the wrongdoing that is alleged to have occurred at Keystone"-a company that Miner once owned and operated. (Doc. 99 at 7).
In response, the Government argues that joinder is appropriate under Rule 8. This is so, the Government contends, even if Miner did not participate in every aspect of the conspiracy, (Doc. 114 at 7 (citing United States v. Thornton , 1 F.3d 149, 153 (3d Cir. 1993) ("[J]oinder would not be improper merely because a defendant did not participate in every act alleged in furtherance of the overarching conspiracy.") ), even if "all evidence adduced is not germane to all counts against each defendant," and even if some evidence is "more damaging to one defendant than others." (Doc. 114 at 12 (quoting United States v. Eufrasio , 935 F.2d 553, 568 (3d Cir. 1991) ) ). According to the Government, *326 with a proper curative instruction, the jury will be able to parse the relevant evidence between Wootton and Miner, and Miner will suffer no prejudice by being subject to a joint trial. (Doc. 114 at 10 (quoting United States v. Dickens , 695 F.2d 765, 768 (3d Cir.1982) ("Neither a disparity in evidence nor the introduction of evidence more damaging to one defendant than another entitles the seemingly less culpable defendant to severance.") ). Indeed, the Government avers, "[e]ven where co-defendants alleging misjoinder are tried with defendants against whom there was evidence of far more heinous and potentially prejudicial crimes, courts have denied severance under Rule 14." (Doc. 114 at 13).
The Government also contests Miner's allegation that his allegedly antagonistic defense warrants severance. According to the Government, the record reveals that, until this point, Wootton's challenges have not sought to shift blame to Miner. Thus, Miner's attempt to sever his trial based upon what he imagines Wootton's defense may be is wholly unsupported and speculative.
Moreover, the Government challenges Miner's reliance upon Provenzano , which, in the Government's view, not only fails to support Miner's position but, in fact, cuts against granting him the relief requested. In Provenzano , the Third Circuit agreed that severance was not warranted, despite Defendant Colter's proffer of what he considered to be an antagonistic defense. Not only did the Provenzano Court fail to see Defendant Colter's alleged defense as meeting the "irreconcilable and mutually exclusive" standard to warrant severance, but the Court understood that the codefendants' placement of blame upon solely Defendant Colter amounted to a legitimate trial defense to conspiracy charges. See Provenzano , 688 F.2d 194, 198 ("We are not persuaded, however, that there was a real antagonism in the defense strategies of this case. Rather, they were complementary, for if the jury had been persuaded that Cotler alone received the payoffs and was unconnected with any of the other defendants, there would have been a failure of proof on the conspiracy and RICO counts."). Thus, the Government argues, Provenzano militates against granting severance in this case which, like in Provenzano , includes a conspiracy charge. Accordingly, the Government concludes, "[b]ecause the evidence against Miner will be substantially the same, whether he is tried separately, or together with his codefendants, there is no significant prejudice from a joint trial," and because Miner "has failed to 'pinpoint clear and substantial prejudice resulting in an unfair trial' that is needed to justify severance," Miner's motion should be denied. (Doc. 114 at 14-15 (quoting United States v. McGlory , 968 F.2d 309, 340 (3d Cir. 1992) ). Once more, the Government's argument carries the day.
In this case, Miner has failed to "demonstrate clear and substantial prejudice resulting in a manifestly unfair trial" such that severance of his trial from that of his codefendants is warranted. Reicherter , 647 F.2d at 400. First, as noted by the Government, Miner has failed to show that his purported defense is "irreconcilable and mutually exclusive" of Wootton's. Aside from a bald allegation that Wootton will "of course" point the finger at Miner, Miner has failed to identify any support for his presupposition that Wootton will try to inculpate Miner in an effort to exculpate himself.
Moreover, even if Wootton's defense does point the finger at Miner, Miner has failed to identify why such a defense is necessarily irreconcilable and/or mutually exclusive of Miner's defense. As noted by the Provenzano Court, if the jury believes *327 Miner's contention that Wootton tampered with Keystone's equipment in an effort to bankrupt the company and cover up Wootton's embezzlement scheme, such a showing would strike at the heart of the Government's conspiracy claims against Wootton, potentially aiding in his acquittal on that charge. The mere fact that two codefendants point an accusatory finger at each other does not mean that such defenses are irreconcilable and mutually exclusive. See United States v. Voigt , 89 F.3d 1050, 1095 (3d Cir.1996) ("[C]ourts have consistently held that finger-pointing and blame-shifting among co-conspirators do not support a finding of mutually antagonistic defenses."). In order to warrant severance based upon irreconcilably antagonistic defenses, a criminal defendant must demonstrate that "acquittal of one co-defendant would necessarily call for the conviction of the other," id. at 1094 (quoting United States v. Tootick , 952 F.2d 1078, 1081 (9th Cir.1991) ), and that, because of these mutually antagonistic defenses, "specific rights were impaired." United States v. Balter , 91 F.3d 427, 433 (3d Cir. 1996). In contending that Wootton embezzled funds and tampered with machinery in an effort to cover up his scheme, Miner has not indicated that if the jury so finds, Wootton must necessarily be convicted of the crimes charged. Likewise, other than generalized assertions that he will be prejudiced as a result of joinder, Miner has failed to identify a specific trial right that would be so impaired. Thus, Miner has failed to meet his "heavy burden" to demonstrate why his trial should be severed from that of his codefendants, and his motion to sever shall be denied. See Reicherter , 647 F.2d at 400.
IV. CONCLUSION
In accordance with the foregoing, all of Defendants' motions to dismiss and to sever shall be denied.
NOW, THEREFORE, IT IS HEREBY ORDERED:
1. Defendants' Motion to Dismiss Counts 1, 3-8, and 9 with Incorporated Brief (Doc. 70) is DENIED.
2. Defendants' Motion to Dismiss Count 9 - Failure to Allege Commission of a Crime (Doc. 72) is DENIED.
3. Defendants' Motion to Dismiss Count 2 - Duplicitous (Doc. 73) is DENIED.
4. Defendants' Motion to Dismiss Count 2 - Statute of Limitations (Doc. 74) is DENIED.
5. Defendant Race Miner's Motion to Dismiss Count 2 (Doc. 93) is DENIED .
6. Defendant Ben Wootton's Motion for Severance of Charges (Doc. 71) is DENIED.
7. Defendant Race Miner's Motion to Sever Defendant (Doc. 98) is DENIED .

In the biodiesel industry, this process is sometimes referred to as "mixing," "blending," or "splashing." These terms are used interchangeably throughout the parties' briefing.

"Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." Alston v. Countrywide Fin. Corp. , 585 F.3d 753, 758-60 (3d Cir. 2009) (quoting United States v. Diallo , 575 F.3d 252, 256 (3d Cir. 2009) ). Thus, where the meaning of the relevant statutory language is clear, no further inquiry is required. See Abdul-Akbar v. McKelvie , 239 F.3d 307, 313 (3d Cir. 2001) (en banc ).

Under the rule of lenity, "an ambiguous criminal statute is to be construed in favor of the accused." Staples v. United States , 511 U.S. 600, 619 n.17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).